# 15-1967

*To Be Argued By*:
BRADLEY T. KING

# United States Court of Appeals

## For the Second Circuit

◆◆◆

JANE DOE, 14 MC 1412,

*Petitioner-Appellee,*

—against—

UNITED STATES OF AMERICA,

*Respondent-Appellant.*

**On Appeal From The United States District Court
For The Eastern District of New York**

## BRIEF AND APPENDIX FOR THE UNITED STATES

KELLY T. CURRIE,
*Acting United States Attorney,*
*Eastern District of New York.*

DAVID C. JAMES,
BRADLEY T. KING,
  *Assistant United States Attorneys,*
    *Of Counsel.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.........................................iii

PRELIMINARY STATEMENT...........................................1

JURISDICTIONAL STATEMENT........................................2

QUESTIONS PRESENTED.............................................2

STATEMENT OF THE CASE..........................................3

STATEMENT OF FACTS.............................................3

    I.   The Offense Conduct...................................3

    II.  Doe's Probationary Record............................4

    III. The Expungement Motion...............................6

        A.   The Motion.......................................6

        B.   The Government's Response........................7

        C.   The District Court's Decision....................9

        D.   The Relief Granted.............................13

SUMMARY OF ARGUMENT...........................................16

ARGUMENT – THE DISTRICT COURT ERRED IN GRANTING
        THE MOTION........................................18

    I.    Under Kokkonen, the District Court
        Lacked Jurisdiction over Doe's
        Expungement Motion................................18

        A.   The Kokkonen Decision..........................18

        B.   Discussion.....................................21

            1.   Equitable Expungement Motions
               Are Not "Factually Interdependent"
               with Earlier Prosecutions.................27

2. Equitable Expungement Motions Do Not Enable a Court to Function Successfully...............................30

C. The District Court Abused its Discretion in Granting Doe's Expungement Motion........................................33

CONCLUSION....................................................44

TABLE OF AUTHORITIES

Page

CASES

Abdelfattah v. Department of Homeland Security,
  787 F.3d 524 (D.C. Cir. 2015)................................ 26

Allen v. Webster,
  742 F.2d 153 (4th Cir. 1984)............................... 24

Camfield v. City of Oklahoma,
  248 F.3d 1214 (10th Cir. 2001)......................... 24, 25

Chastain v. Kelley,
  510 F.2d 1232 (D.C. Cir. 1975)............................ 26

Doe v. United States,
  -- F.Supp.3d --, 2015 WL 2452613
  (E.D.N.Y. May 21, 2015)................................ passim

Garcia v. Teitler,
  443 F.3d 202 (2d Cir. 2006)........................ 20, 22, 29

Hendrickson v. United States,
  791 F.3d 354 (2d Cir. 2015)............................... 18

Joefield v. United States,
  No. 13 MC 367, 2013 WL 3972650 (E.D.N.Y. Aug. 5, 2013)...... 41

Kokkonen v. Guardian Life Ins. Co. of America,
  511 U.S. 375 (1994).................................... passim

Kowall v. United States,
  53 F.R.D. 211 (W.D. Mich. 1971)........................... 36

Livingston v. United States Dep't of Justice,
  759 F.2d 74 (D.C. Cir. 1985)........................... 26, 40

Marbury v. Madison,
  5 U.S. 137 (1803)........................................ 37

Morrow v. District of Columbia,
  417 F.2d 728 (D.C. Cir. 1969)............................. 20

Peacock v. Thomas,
  516 U.S. 349 (1996)................................... 28, 29

Peters v. Hobby,
   349 U.S. 331 (1955) ......................................... 37

Rogers v. Slaughter,
   469 F.2d 1084 (5th Cir. 1972) ............................... 35

Sealed Appellant v. Sealed Appellee,
   130 F.3d 695 (5th Cir. 1997) ................... 26, 34, 37, 40

Tokoph v. United States,
   774 F.3d 1300 (10th Cir. 2014) ......................... passim

United States v. Allah,
   130 F.3d 33 (2d Cir. 1997) ................................. 21

United States v. Banks,
   Nos. 5:90-CR-115-01, 5:94-CR-5, 2013 WL 5806286
   (N.D.W.Va. Oct. 29, 2013) .................................. 24

United States v. Barrow,
   No. 06 Cr. 1084 (JFK), 2014 WL 2011689
   (S.D.N.Y. May 16, 2014) .................................... 41

United States v. Coloian,
   480 F.3d 47 (1st Cir. 2007) ................... 22, 23, 28, 30

United States v. Cotton,
   535 U.S. 625 (2002) ........................................ 18

United States v. Doe,
   No. 710-CR-892 (CBM), 2004 WL 1124687
   (S.D.N.Y. May 20, 2004) ......................... 38, 39, 40

United States v. Doe,
   935 F. Supp. 478 (S.D.N.Y. 1996) ................ 38, 39, 40

United States v. Doe,
   859 F.2d 1334 (8th Cir. 1988) .............................. 40

United States v. Dunegan,
   251 F.3d 477 (3d Cir. 2001) ................................ 23

United States v. Field,
   756 F.3d 911 (6th Cir. 2014) ............................... 23

United States v. Flowers,
   389 F.3d 737 (7th Cir. 2004) ..................... 24, 25, 43

United States v. G.,
  774 F.2d 1392 (9th Cir. 1985)................................. 2

United States v. Harrell,
  268 F.3d 141 (2d Cir. 2001)................................. 18

United States v. Harris,
  847 F.Supp.2d 828 (D. Md. 2012)........................... 24

United States v. Janik,
  10 F.3d 470 (7th Cir. 1993)................................ 25

United States v. Linn,
  513 F.2d 925 (10th Cir. 1975).............................. 35

United States v. Lucido,
  612 F.3d 871 (6th Cir. 2010)........................... passim

United States v. McLeod,
  385 F.2d 734 (5th Cir. 1967)........................... 37, 43

United States v. Meyer,
  439 F.3d 855 (8th Cir. 2006)...................... 23, 32, 34

United States v. Mitchell,
  683 F.Supp.2d 427 (E.D. Va. 2010).......................... 24

United States v. Paxton,
  No. 3:99CR91-WHA, 2007 WL 2081483
  (M.D. Ala. July 20, 2007).................................24

United States v. Pinto,
  1 F.3d 1069 (10th Cir. 1993)...................... 25, 26, 36

United States v. Rowlands,
  451 F.3d 173 (3d Cir. 2006)........................... 34, 35

United States v. Schnitzer,
  567 F.2d 536 (2d Cir. 1977)........................... passim

United States v. Smith,
  940 F.2d 395 (9th Cir. 1991)........................... 41, 42

United States v. Sumner,
  226 F.3d 1005 (9th Cir. 2000)......................... passim

United States v. Williams,
  504 U.S. 36 (1992)........................................ 18

Veltri v. Bldg. Serv. 32B-J Pension Fund,
  393 F.3d 318 (2d Cir. 2004)................................. 21

<u>STATUTES</u>

18 U.S.C. § 5005 (repealed)................................. 38

18 U.S.C. § 5021 (repealed)................................. 39

28 U.S.C. § 534............................................. 33

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 15-1967

JANE DOE, 14 MC 1412,

Petitioner-Appellee,

-against-

UNITED STATES OF AMERICA,

Respondent-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

The United States appeals from two orders entered on
May 21 and 22, 2015, in the United States District Court for the
Eastern District of New York (Gleeson, J.), which granted the
Petitioner-Appellee Jane Doe's[1] motion to expunge her conviction
for health care fraud in violation of 18 U.S.C. § 1347 and which

---

[1]  "Jane Doe" is a pseudonym.  Pursuant to the order of
the district court, the caption was amended to substitute "Jane
Doe" for the petitioner's true name.

2

required the government to delete, seal, or secure references to that conviction contained in records maintained by the executive and judiciary.  See Jane Doe v. United States, -- F.Supp.3d --, 2015 WL 2452613 (E.D.N.Y. May 21, 2015).

## JURISDICTIONAL STATEMENT

The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731.  See United States v. G., 774 F.2d 1392, 1393-94 (9th Cir. 1985).  The district court had jurisdiction over Doe's underlying criminal case pursuant to 18 U.S.C. § 3231, and the court held that it had ancillary jurisdiction to consider Doe's motion to expunge her conviction, see Doe, 2015 WL 2452613, at *4 n.16.  As set forth below, however, the government contends that the district court's exercise of ancillary jurisdiction was improper under Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 379-81 (1994).  Timely notice of appeal was filed on June 19, 2015.

## QUESTIONS PRESENTED

1.  Whether the district court erred as a matter of law in ruling that it had ancillary jurisdiction to expunge Doe's health care fraud conviction.

2.  Whether, even assuming that the district court had ancillary jurisdiction, the court abused its discretion in expunging Doe's health care fraud conviction.

STATEMENT OF THE CASE

In 2001, a jury found Doe guilty of violating 18 U.S.C. § 1347, based on her role in an auto insurance fraud scheme. On March 25, 2002, Doe was sentenced to five years' probation, ten months' home detention, a restitution order of $46,701, and a $100 special assessment.

On October 30, 2014, Doe filed a pro se motion asking the district court to expunge her criminal record. The district court granted that motion on May 21, 2015.

STATEMENT OF FACTS

I.   The Offense Conduct

In November 1999, agents with the Federal Bureau of Investigation, U.S. Postal Inspector's Service, and the New York State Insurance Fraud Bureau began investigating an insurance fraud scheme involving a well-organized syndicate of individuals who purposefully caused automobile accidents so that they could collect payments from fraudulently submitted insurance claims. (SA 18 ¶ 2).[2] Doe's conviction was based upon her participation in this scheme. Specifically, on August 1, 1997, Doe was a passenger in a car the driver of which purposely caused an automobile accident in Queens, New York. (SA 22 ¶ 16). Following this staged accident, Doe falsely claimed that she was

---

[2]   "GA," and "SA" refer to the government's appendix and the sealed appendix, respectively.

injured, filed a no-fault insurance claim, and received unnecessary medical services related to her alleged injury. (See id.).

Additionally, pursuant to Federal Rule of Evidence 404(b), the government proved at trial that Doe was involved in three other staged accidents that occurred on November 10, 1998, May 9, 2000, and October 23, 2000. (SA 22-23 ¶ 17). In each of these three "accidents," the passengers in Doe's car were two of her minor children. (Id.; SA 25 ¶ 35). Doe sought civil judgments on behalf of herself and her children for these accidents, which were included as relevant conduct in the Probation Department's intended fraud loss calculation. (SA 22-23 ¶ 17).

II.  Doe's Probationary Record

In its decision granting Doe's motion, the district court noted that it had reviewed the Probation Department's approximately 1000-page files on Doe and found that, during the five years Doe was on probation, she had consistently sought employment but struggled to keep jobs. For several months in 2003, she worked as a manager at a homeless shelter, which the district court referred to as Agency One,[3] but was terminated for

---

[3]    To preserve confidentiality, the district court did not refer to names of the agencies that employed Doe while she was serving her probationary sentence. See Doe, 2015 WL 2452613

reasons "apparently for reasons unrelated to her conviction." Doe, 2015 WL 2452613, at *2.

In March 2004, Doe worked as a counselor at a home that housed persons with mental disabilities (Agency Two). The probation officer noted that Doe's supervisor at Agency Two was unaware of her conviction. An August 2, 2004 report states that Doe quit this job because it became "too much for her [to] handle" and that Doe instead briefly worked as a health aide taking blood pressure. (SA 40). She returned to Agency Two shortly thereafter, but, by September 2004, she was back on public assistance for undisclosed reasons. See Doe, 2015 WL 2452613 at *2.

Next, for about seven months, Doe worked as a resident aide at a home for the mentally ill (Agency Three), before being terminated for reasons that are also unclear.[4] Doe told her probation officer around this time that many employers refused to hire her because background checks revealed her conviction for health-care fraud. See Doe, 2015 WL 2452613 at *2-*3.

_____

at *2 n.2. The government will adhere to that convention in this brief. The names of Doe's employers are contained in the Probation Department's files.

[4] Doe told the Probation Department that the reason for her termination from Agency Three was "bed bugs." (SA 53). The reference to bed bugs is not explained in the probation file.

In December 2005, Doe was hired by a home for the elderly (Agency Four) as a home health aide.  She left the job because the employer would not allow Doe time off to see her doctor for a thyroid condition.  She got a job with another agency (Agency Five).  Two months later, the agency learned of Doe's conviction for health care fraud and fired her.  The Probation file notes that Agency Five's staff concluded that there was a direct relationship between Doe's criminal offense, which included the submission of fraudulent medical claims, and her specific employment as an aide in the health care field. (SA 69).  Around this time, Doe wrote a note to her probation officer asking that the officer "talk to the judge about my situation, criminal record," explaining that she was a "good hardworking woman" and "single parent" with four children.  "I don't like welfare," she added, "I like to work."  Doe, 2015 WL 2452613 at *3.  Doe remained unemployed from July 2006 to the end of her probation term in March 2007.  Id.

III. The Expungement Motion

      A.    The Motion

On October 30, 2014, nearly thirteen years after her conviction and more than seven years after completing probation, Doe filed a pro se motion asking the district court to expunge her criminal record.  (SA 78).  She argued that her conviction

caused her to be "repeatedly terminated" from employment in the healthcare field. (Id.). And she further asserted that her conviction should be expunged because she had successfully completed her probationary period and had led a law-abiding life since her conviction. (Id.).

B.    The Government's Response

On November 26, 2014, the Honorable John Gleeson, who had presided over Doe's health care fraud trial, issued an order requesting that the government consider consenting to an order expunging Doe's criminal record. (SA 83). In requesting such consent, the court relied upon a 2011 letter in which then-Attorney General Eric Holder, Jr. urged state legislatures and attorneys general to "review the more than 38,000 collateral consequences that exist in jurisdictions across the country and to eliminate those that do nothing to increase the public safety." (SA 82-83). Citing Attorney General Holder's letter, the court reasoned that expungement would promote public safety because it would permit Doe and convicted criminals like her to obtain gainful employment and stable housing and thereby avoid "future arrests and incarceration." (SA 83).

The government elected not to consent to the entry of an expungement order and submitted a memorandum in opposition, arguing that Doe's alleged employment difficulties did not

constitute the extreme circumstances necessary to warrant the extraordinary relief of expungement. (SA 87). The government also noted that Doe's motion did not make clear whether she "fully disclosed her criminal background to all of her prospective employers" before they allegedly terminated her. (SA 91 n.3).

On March 9, 2015 the court held oral argument on the motion to expunge Doe's conviction. Doe's counsel asserted that she had been fired "five" or "six" times by employers in the healthcare field who had discovered her fraud conviction after hiring her. (SA 98-99). Acknowledging that "there [are] plenty of cases" holding that adverse employment consequences were "inadequa[te]" to establish the "extreme" circumstances necessary to warrant the equitable remedy of expungement, the court inquired whether there was a "dispute" about the facts. (SA 101-02). In response, the government stated that it "d[id]n't think" there was a factual dispute but also noted that the facts stated in Doe's motion and those stated by her counsel at oral argument did not make clear whether Doe was fully disclosing her conviction to employers before the alleged repeated terminations. (SA 102). Defense counsel then asserted that Doe was disclosing her conviction before her employment,

and the court ended the oral argument, taking the expungement motion under advisement. (SA 102-03).

    C.    <u>The District Court's Decision</u>

    On May 21, 2015 the district court issued a memorandum and order granting Doe's motion to expunge her conviction. <u>Doe</u>, 2015 WL 2452613 at *6. The court recognized that, under this Court's precedent, equitable expungement was reserved for "extreme circumstances." <u>Id.</u> at *4 (citing <u>United States v. Schnitzer</u>, 567 F.2d 536, 539-540 (2d Cir. 1977)). The court further acknowledged that district courts in the Second Circuit applying this standard had repeatedly concluded that adverse employment consequences are insufficient to warrant expungement. <u>Id.</u> at *5 n.27. And, in a lengthy footnote, the court noted that there was a split of authority in the federal courts of appeal concerning whether district courts even had ancillary jurisdiction to decide expungement motions that, like Doe's, were based upon equitable considerations. <u>Id.</u> at *4 n.16.

    With respect to the jurisdictional analysis, the court recognized that the Supreme Court's 1994 decision in <u>Kokkonen v. Guardian Life Ins. Co.</u>, 511 U.S 375 (1994), limited district courts' exercise of ancillary jurisdiction to situations where such jurisdiction is necessary to "(1) permit disposition by a single court of claims that are, in varying respects and

degrees, factually interdependent and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." See Doe, 2015 WL 2452613 at *4 n.16 (internal quotation marks omitted). The court asserted that the federal courts of appeal "disagree . . . with respect to whether district courts have ancillary jurisdiction . . . to expunge records of lawful convictions based on equitable considerations." Id.

The district court distinguished Kokkonen, reasoning that, although the Supreme Court held in that case that a district court did not have ancillary jurisdiction over a settlement agreement that arose from a federal breach of agency action, "an expungement proceeding is different in kind" because it requires the court to exercise its discretion based upon, among other things, "the facts underlying the conviction and sentence and the extensive factual record created while Doe was under this Court's supervision for five years." Id. Based on this reasoning, the court concluded that "few things could be more essential to "the conduct of federal-court business" than "the appropriateness of expunging the public records that business creates." Id.

With respect to this Court's expungement standard, which was announced nearly four decades ago in Schnitzer, the

district court explained that expungement applications are
"'usually granted only in extreme circumstances'" and need to be
examined on an individual basis to determine whether the
petitioner's alleged harm outweighs the government's interest in
maintaining accurate records of arrests and convictions. Id. at
*4 (citing Schnitzer, 567 F.2d at 540 (quotation and citation
omitted)). Applying this standard, the district court
determined that Doe's circumstances were "sufficient to warrant
expungement." Id. at *5.

The court reasoned that employers are entitled to know
about past convictions of job applicants, but it assumed that
there are cases "in which all reasonable employers would
conclude that the conviction is no longer a meaningful
consideration." Id. at *1. Despite being "acutely aware" of
the scarcity of successful expungement applications, the
district court stated that Doe's situation fell within the
category of extraordinary circumstances warranting expungement
because her conviction was long ago, and since then Doe's
conviction "has had a dramatic adverse impact on her ability to
work." Id. at *5.

In reaching this conclusion, the court relied on facts
drawn from the Probation Department's file chronicling Doe's
probationary term, which covered the period from March 2002 to

March 2007. The court identified only one employer (Agency Five) that, according to the Probation Department's records, had fired Doe because of her criminal conviction. However, based upon defense counsel's statements at oral argument that Doe had been fired five to six times because of her conviction and the government's decision not to ask for a hearing (SA 99, 102), the court found that "once [an employer] learn[s] of Doe's conviction, she gets fired," and this had happened "to her half a dozen times." Id. at *3.

After making its factual findings, the court ruled that Doe's conviction for health insurance fraud did not impose any "heightened risk" to employers within the health care industry. Id. at *6. The court rejected the government's contention that Doe's circumstances were not sufficiently extreme to warrant expungement. Id. at *5.[5]

In concluding, the court suggested that other judges should consider broader uses of the expungement power, writing that Doe's case "highlights the need to take a fresh look" at the continuing effects that criminal convictions can have. Id. at *6. "The seemingly automatic refusals by judges to expunge convictions when the inability to find employment is the 'only'

---

[5] The court also cited Doe's race and age as impediments in overcoming unemployment. Id. at *4 (citing two academic studies).

ground for the application have undervalued the critical role employment plays in re-entry." Id. Moreover, such refusals are "out of step with public opinion." Id.

D. The Relief Granted

Having concluded that expungement was appropriate, the court turned to fashioning the appropriate relief. In its May 21 order the court directed the government to place in a separate storage facility the petitioner's "arrest and conviction records, and any other documents relating to this case." Doe, 2015 WL 2452613 at *6. With respect to electronic records, the court ordered the government to "delete" from its "databases, electronic filing systems, and public record" any "references" to Doe's conviction. Id. The court further ordered that Doe's true name was to "be removed from any official index or public record" and that the cordoned-off records in the government's possession "are not be opened other than in course of a bona fide criminal investigation by law enforcement authorities and only when necessary for such an investigation." Id. After reciting these requirements, the court requested the parties' input concerning the relief granted, stating that its intention was to ensure that "no inquiry of the federal or state government by a prospective employer should result in the disclosure of Doe's conviction"

without "unduly burdening those governments or impairing their legitimate law enforcement interests." Id. at *7.

One day later, the court entered a second order requiring the clerk's office for the Eastern District of New York to seal "the entire matter" pertaining to the underlying criminal case of United States v. Lucien, 00-CR-1274, a case involving thirty-seven other defendants, two of whom — Jean Maxon Lucien and Frantz Mevs, the primary targets of the health care fraud investigation that resulted in Doe's conviction — absconded following their arraignments and are still at large. (See GA 1-2, 5/22/2015 docket entry; GA 19).

On June 19, 2015, the government filed its Notice of Appeal and four days later it submitted a letter asking the district court for permission to submit proposed modifications to its May 21 and 22 Orders should it ultimately decline to pursue an appeal in this case. (GA 19-20). On June 24, 2015, the court granted the government's application for an opportunity to address the scope and implementation of the court's orders should the government elect to withdraw its appeal. (GA 2, 6/24/2015 docket entry). The court also "suggest[ed]" that the government bring any concerns about the orders to the court's attention during the pendency of the

appeal so that the court could provide the "Court of Appeals its view regarding the issues raised" by those concerns.  (Id.).

SUMMARY OF ARGUMENT

The district court erred in granting Doe's expungement motion because it lacked jurisdiction to consider it. Contrary to the district court's conclusion, the federal courts of appeal that have considered whether Kokkonen authorizes federal courts to exercise ancillary jurisdiction over equitable expungement motions have uniformly concluded that the exercise of such jurisdiction is improper because it does not further either of the purposes of ancillary jurisdiction that the Supreme Court identified in Kokkonen. Equitable expungement motions concern facts that are distinct from the underlying criminal case, which a district court already presided over and disposed of. And, as several circuit courts of appeal have reasoned, exercising ancillary jurisdiction over equitable expungement motions contravenes principles of separation of powers and federalism because it allows a district court to undo a conviction that was properly obtained and also allows a district court to contravene federal and state statutes mandating the preservation of criminal records and imposing collateral consequences upon persons convicted of crimes.

Furthermore, the district court's conclusion that Doe's inability to obtain employment in her chosen field was sufficient to permit expungement under this Court's

extraordinary circumstances test was incorrect. Like other courts that recognized district courts' ability to exercise ancillary jurisdiction over equitable expungement motions before <u>Kokkonen</u>, this Court has held that such "extraordinary" relief was appropriate only in "extreme" circumstances that involved basic procedural improprieties such as unconstitutional statutes, mass arrests without probable cause, arrests made solely to harass individuals engaging in lawful behavior, or police misuse of arrest records to the detriment of the accused. Doe's case, by contrast, involves a valid arrest, trial, and conviction and the usual attendant consequences of having sustained a lawful criminal conviction. Accordingly, the district court abused its discretion in expunging Doe's conviction.

ARGUMENT

THE DISTRICT COURT ERRED
IN GRANTING THE MOTION

I.    Under Kokkonen, the District Court Lacked
      Jurisdiction over Doe's Expungement Motion[6]

      A.    The Kokkonen Decision

            Kokkonen was a civil case that involved a dispute
concerning a settlement agreement that was entered after the
district court had dismissed a breach of agency suit with
prejudice based upon the settlement agreement.  See 511 U.S. at
376-77.  The dismissal order did not reference the settlement
agreement or reserve the district court's jurisdiction to
enforce it.  See id.  The district court in Kokkonen
nevertheless held that it had ancillary jurisdiction over a
claim that one party had breached the settlement agreement.

            In reversing, the Supreme Court noted that federal
courts have a limited jurisdiction conferred only by the

_____

      [6]    Although the government did not argue in district
court that the court lacked jurisdiction to consider Doe's
expungement motion, "subject-matter jurisdiction, because it
involves a court's power to hear a case, can never be forfeited
or waived."  United States v. Cotton, 535 U.S. 625, 630 (2002).
Moreover, because the district court actually considered and
ruled upon the jurisdictional issue, the issue is preserved for
appellate review in any event.  See United States v. Harrell,
268 F.3d 141, 146 (2d Cir. 2001) (an argument is preserved for
appellate review if it was "pressed or passed upon below.")
(quoting United States v. Williams, 504 U.S. 36, 41 (1992))
(emphasis added).  Accordingly, this Court reviews the
jurisdictional issue de novo.  See Hendrickson v. United States,
791 F.3d 354, 358 (2d Cir. 2015).

"Constitution and statute," which "is not to be expanded by judicial decree." 511 U.S at 377. Moreover, "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." Id. The Court explained that the doctrine of ancillary jurisdiction has two purposes: (i) to permit a single court to dispose of "factually interdependent" claims and (ii) to enable a court to function successfully by "manag[ing] its proceedings, vindicat[ing] its authority, and effectuat[ing] its decrees." Id. at 379-80. The Court held that neither of these purposes supported the district court's exercise of jurisdiction over the settlement agreement.

First, the facts underlying the original breach of agency suit "ha[d] nothing to do" with the facts related to the settlement agreement dispute. Id. at 380. Thus, "it would be neither necessary nor even particularly efficient that they be adjudicated together." Id. Second, the Court held that enforcement of the settlement agreement was unrelated to the district court's ability to function successfully because the district court's dismissal order was "in no way flouted or imperiled by the alleged breach of the settlement agreement." Id. As examples of cases where the exercise of ancillary jurisdiction to enable a federal court's successful functioning

would be appropriate, the Court cited cases involving contempt proceedings and sanctions for attorney misconduct. See id. at 379-80.

The Kokkonen Court concluded that the district court's exercise of ancillary jurisdiction was improper because it was not authorized by statute, the facts to be determined with respect to the settlement agreement breach were "quite separate" from the those involved in the original breach of agency suit, and exercising ancillary jurisdiction was "in no way essential to the conduct of federal court business." Id. at 381.

When applying Kokkonen, this Court has made clear that in exercising ancillary jurisdiction in criminal matters, a district court must ensure that it is acting "'within the scope of its jurisdiction.'" Garcia v. Teitler, 443 F.3d 202, 208 (2d Cir. 2006) (quoting Morrow v. District of Columbia, 417 F.2d 728, 737 (D.C. Cir. 1969)). Such authority should be used to "'effectively dispose of the principal case'" and to "'do complete justice in the premises.'" Id. (quoting Morrow, 417 F.2d at 738 n.36, 740) (emphasis added)).

In Garcia, this Court concluded that it was proper for a district court to resolve an attorney's fee dispute that arose in a pending prosecution. See id. at 208-09. That dispute properly related to the main action because it arose following a

Curcio hearing, which was necessary to ensure the proper representation of two defendants in an "ongoing" prosecution. See id. at 209. In addition, resolving the fee dispute related to the district court's management of the prosecution because its resolution could allow the defendants to secure counsel of their choosing or permit reimbursement from the defendants for the services of counsel appointed pursuant to the Criminal Justice Act. See id. at 209-10.

B. Discussion

Although this Court held in Schnitzer that courts had ancillary jurisdiction to expunge convictions on equitable grounds in certain circumstances,[7] see 567 F.2d at 538-39, that 38-year-old precedent should be re-examined in light of Kokkonen. As this Court has explained, "[O]ne panel of this Court cannot overrule a prior decision of another panel," unless "there has been an intervening Supreme Court decision that casts doubt on [this Court's] controlling precedent." Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 327 (2d Cir. 2004) (emphasis added); see also, e.g., United States v. Allah, 130 F.3d 33, 38 (2d Cir. 1997). Indeed, the district court itself implicitly recognized that Kokkonen required re-examination of Schnitzer when it analyzed the jurisdictional issue in light of

---

[7]    As we argue in the next section, the court's exercise of ancillary jurisdiction was also erroneous under Schnitzer.

the criteria established by Kokkonen, rather than simply relying upon Schnitzer's holding. See 2015 WL 2452613 at *4 n.16.

Schnitzer's rationale is inconsistent with Kokkonen's. Schnitzer relied to a substantial degree on considerations of "judicial economy" that Kokkonen does not recognize as a basis for ancillary jurisdiction, and Schnitzer did not purport to hold that expungement actions fall within the narrow classes of ancillary claims that were later sanctioned in the Kokkonen decision. See Schnitzer, 567 F.2d at 538. Further, this Court has not reaffirmed Schnitzer since Kokkonen,[8] and several courts of appeal have questioned Schnitzer's continuing validity. See United States v. Coloian, 480 F.3d 47, 52 (1st Cir. 2007) (noting that Schnitzer and other cases recognizing ancillary jurisdiction over expungement motions "either predate Kokkonen, or they fail to address that decision, which raises questions as to their continued viability"); see also United States v.

---

[8]    In Garcia, this Court cited Schnitzer in observing that "courts have long exercised ancillary jurisdiction in criminal matters."    443 F.3d at 207.    In explaining that "[o]ther courts have similarly held that a district court has ancillary jurisdiction to expunge criminal records," the Court cited the Ninth Circuit's decision in United States v. Sumner, 226 F.3d 1005 (9th Cir. 2000), which, as explained below, held that ancillary jurisdiction does not extend to equitable expungement motions based upon a "valid arrest and conviction," but that district courts may exercise such jurisdiction to "expung[e] the record of an unlawful arrest or conviction, or to correct[] a clerical error." Garcia, 443 F.3d at 207 (citing Sumner, 226 F.3d at 1014).

Lucido, 612 F.3d 871, 875-76 (6th Cir. 2010) (stating that the court "join[ed] all four circuits that have considered [expungement motions] and that have addressed Kokkonen in doing so" while noting that all contrary decisions "predate[d] Kokkonen" or "never discuss[ed] or even cite[d] Kokkonen"). Thus, in light of Kokkonen, Schnitzer does not establish that district courts have ancillary jurisdiction over equitable expungement motions.

The district court asserted that there was disagreement among federal courts concerning whether district courts had jurisdiction over motions seeking to expunge valid convictions based upon equitable considerations. See Doe, 2015 WL 2452613 at *4 n.16. However, every circuit that has applied Kokkonen's factors to motions that sought to expunge valid arrests or convictions upon equitable grounds has concluded that district courts do not have ancillary jurisdiction over such motions. See United States v. Field, 756 F.3d 911, 915-16 (6th Cir. 2014); Lucido, 612 F.3d at 875-76; Coloian, 480 F.3d at 52; United States v. Meyer, 439 F.3d 855, 859-60 (8th Cir. 2006); United States v. Dunegan, 251 F.3d 477, 480 (3d Cir. 2001); Sumner, 226 F.3d at 1014-15.

In addition, district courts in the Fourth Circuit have concluded that, although a pre-Kokkonen Fourth Circuit case

(Allen v. Webster, 742 F.2d 153 (4th Cir. 1984)) holds that courts may consider equitable expungement motions, that decision has been effectively overruled by Kokkonen. See, e.g., United States v. Banks, Nos. 5:90-CR-115-01, 5:94-CR-5, 2013 WL 5806286, at *3-*4 (N.D.W.Va. Oct. 29, 2013); United States v. Harris, 847 F.Supp.2d 828, 835 (D. Md. 2012); United States v. Mitchell, 683 F.Supp.2d 427, 432 (E.D. Va. 2010). And although the Eleventh Circuit has not considered the propriety of equitable expungement motions, district courts in the Eleventh Circuit have similarly concluded that Kokkonen bars such motions. See United States v. Paxton, No. 3:99CR91-WHA, 2007 WL 2081483, at *1 (M.D. Ala. July 20, 2007) (noting that, under "the post-Kokkonen analysis," the court "simply does not have ancillary jurisdiction to expunge criminal records on equitable grounds alone").

The only post-Kokkonen circuit cases that have reached a different conclusion or expressed a divergent view in dicta did so without ever mentioning Kokkonen. See Tokoph v. United States, 774 F.3d 1300, 1305 (10th Cir. 2014); United States v. Flowers, 389 F.3d 737, 739 (7th Cir. 2004); Camfield v. City of Oklahoma, 248 F.3d 1214, 1234 (10th Cir. 2001). For example, Flowers did not cite Kokkonen, and it based its finding of ancillary jurisdiction on a pre-Kokkonen Seventh Circuit case,

which it interpreted as permitting district courts to expunge only judicial records and not those maintained by the executive branch (which the district court ordered expunged in this case) in "extraordinary" circumstances. <u>See</u> <u>Flowers</u>, 389 F.3d at 738-39 (citing <u>United States v. Janik</u>, 10 F.3d 470, 472 (7th Cir. 1993)).

The Tenth Circuit in <u>Tokoph</u> also did not mention <u>Kokkonen</u> when rejecting a defendant's effort to expunge a conviction that had been set aside under the Federal Youth Corrections Act. <u>See</u> 774 F.3d at 1305-06. But it concluded that "[t]here is no applicable inherent equitable authority to grant expunction of a valid conviction." <u>Id.</u> Instead, such extreme relief was reserved for convictions that were rendered "invalid[]" because they were "unconstitutional, illegal, or obtained through government misconduct." <u>Id.</u> (quoting <u>United States v. Pinto</u>, 1 F.3d 1069, 1070 (10th Cir. 1993)) (internal quotation marks omitted); <u>see also</u> <u>Camfield v. City of Oklahoma</u>, 248 F.3d 1214, 1234 (10th Cir. 2001) (stating in dicta that "courts have inherent equitable authority to order the expungement of an arrest record or a conviction in rare or extreme instances.").[9]

---

[9] In elucidating this standard in <u>Pinto</u>, a pre-<u>Kokkonen</u> case, the Tenth Circuit explained that where "[t]he sole contention is that [the] [d]efendant has been punished enough,

Likewise, the Fifth Circuit in <u>Sealed Appellant v. Sealed Appellee</u>, 130 F.3d 695 (5th Cir. 1997), concluded without citing <u>Kokkonen</u> that a petitioner seeking expungement of executive branch records "must show an affirmative rights violation" — such as the baseless arrests of African Americans to prevent them from voting — to "me[e]t the high standard" necessary for obtaining that "burdensome" remedy, which "subverts Congress's otherwise express desire to preserve and maintain all criminal records." <u>Id.</u> at 698, 699, 700.

Similarly, the District of Columbia Circuit has, without considering <u>Kokkonen</u>, concluded that "'federal courts are empowered to order the expungement of Government records where necessary to vindicate rights secured by the Constitution or statute.'" <u>Abdelfattah v. Department of Homeland Security</u>, 787 F.3d 524, 536 (D.C. Cir. 2015) (quoting <u>Chastain v. Kelley</u>, 510 F.2d 1232, 1235 (D.C. Cir. 1975)); <u>see also</u> <u>Livingston v. United States Dep't of Justice</u>, 759 F.2d 74, 77-79 (D.C. Cir. 1985) (reasoning that courts have "inherent, equitable power to expunge arrest records" and that exercise of such authority "may" be appropriate with respect to an entry for a demonstrably "suspect" arrest on the petitioner's "rap sheet").

---

and that the presence of the conviction is unjustly interfering with her efforts to rebuild her life. . . . the trial court was without power to expunge this conviction." 1 F.3d at 1070.

Nonetheless, the district court in this case concluded that Kokkonen supported its exercise of ancillary jurisdiction over Doe's expungement motion. See Doe, 2015 WL 2452613 at *4 n.16. However, as the circuit courts that have considered Kokkonen have uniformly determined, neither of the two purposes for exercising ancillary jurisdiction that the Supreme Court recognized in Kokkonen would be furthered by extending federal courts' limited jurisdiction to reach such suits. See, e.g., Sumner, 226 F.3d at 1014 (holding that "[e]xpungement of a criminal record solely on equitable grounds, such as to reward a defendant's rehabilitation and commendable post-conviction conduct, does not serve of [the] goals" of ancillary jurisdiction set forth in Kokkonen).

### 1. Equitable Expungement Motions Are Not "Factually Interdependent" with Earlier Prosecutions

As all the courts of appeal to consider expungement after Kokkoken have concluded, requests to expunge valid convictions principally turn on equitable claims about a defendant's post-conviction circumstances that are not "factually interdependent" with the issues litigated during the trial itself. See, e.g., Lucido, 612 F.3d at 875 (holding that expungement motions are not "factually interdependent" with criminal cases because they "turn on different facts" and "rest on different sources of authority: a grand jury's authority to

indict in the one instance and a federal court's authority to remove any record of the indictment in the other."); Coloian, 480 F.3d at 50, 52 (noting that "the original claims brought before the district court in this case have nothing to do with the equitable grounds upon which [the petitioner] seeks the expungement of his criminal record.").

Moreover, under the reasoning of the Supreme Court's post-Kokkonen decision in Peacock v. Thomas, 516 U.S. 349 (1996), an expungement motion cannot be "factually interdependent" with the underlying criminal case for purposes of establishing ancillary jurisdiction because the expungement motion is not made until the criminal case is over. In Peacock, a plaintiff who had obtained a judgment against a corporation in a federal ERISA action brought a subsequent federal suit against an officer and shareholder of the corporation, alleging that the defendant had "siphon[ed]" off corporate assets to prevent satisfaction of the ERISA judgment. Id. at 352. The Supreme Court held that the district court did not have ancillary jurisdiction over the second lawsuit. The Court ruled that the first Kokkonen criterion, i.e., whether the exercise of ancillary jurisdiction would permit the resolution of "factually interdependent" claims, was not satisfied because, inter alia,

the first case had already been resolved by the time the second one was filed:

> In a subsequent lawsuit involving claims with no independent basis for jurisdiction, a federal court lacks the threshold jurisdictional power that exists when ancillary claims are asserted in the same proceeding as the claims conferring federal jurisdiction. Consequently, claims alleged to be factually interdependent with and, hence, ancillary to claims brought in an earlier federal lawsuit will not support federal jurisdiction over a subsequent lawsuit. The basis of the doctrine of ancillary jurisdiction is the practical need to protect legal rights or effectively to resolve an entire, logically entwined lawsuit. <u>But once judgment was entered in the original ERISA suit, the ability to resolve simultaneously factually intertwined issues vanished</u>.

Id. at 355 (emphasis added, citations and internal quotation marks omitted).

Similarly, once the district court entered judgment in Doe's criminal case, its ability to exercise jurisdiction over ancillary proceedings on the ground that they were "factually interdependent" with the criminal case "vanished."[10]   The first

---

[10]    This Court's decision in <u>Garcia</u> is consistent with this analysis because, in that case, the attorney fee dispute arose <u>during</u> the criminal case.   Moreover, not only were the facts and procedural history of the criminal case relevant to the fee dispute, but the proper resolution of the fee dispute also served to protect the defendants' right to counsel in the criminal case.   <u>See</u> 443 F.3d at 209-10.

_Kokkonen_ criterion therefore does not support the district court's exercise of ancillary jurisdiction in this case.

> 2. Equitable Expungement Motions Do Not Enable
>    a Court to Function Successfully

With respect to _Kokkonen's_ second criterion, courts have rejected the rationale that exercising ancillary jurisdiction over equitable expungement motions is necessary to further _Kokkonen's_ goal of allowing federal courts to function successfully. As the Sixth Circuit explained in _Lucido_:

> What is it about managing a criminal case, vindicating its power over the case and effectuating any orders in the case that requires a district court to have authority, sixteen years later, to remove any record held by any federal entity of the proceeding? None that we can see. These criminal cases have long since been resolved, and there is nothing left to manage, vindicate or effectuate. So long as the records of what happened in the proceedings — [here,] that [the petitioner] was twice indicted and twice acquitted — are accurate, it is difficult to see what business the courts have as a matter of inherent power in removing any trace of the proceedings.

612 F.3d at 875 (quoting _Kokkonen_, 511 U.S. at 379-80 (internal quotation marks and alterations omitted); _see also Coloian_, 480 F.3d at 52 ("The existence and availability of [the petitioner's] criminal records do not frustrate or defeat his acquittal. In fact, the records are entirely consistent with

and respectful of the jury's ultimate judgment . . . as they accurately document his arrest, trial and acquittal").

The district court asserted that "few things could be more essential to 'the conduct of federal court business' than the appropriateness of expunging the public records that business creates." 2015 WL 2452613 at *4 n.16. But this assertion is question-begging. The court did not identify any judicial function, authority, or decree that would be impeded if courts lacked the ability to expunge conviction records maintained by the executive branch. Nor did the court explain why "the conduct of court business" requires authority to eradicate accurate records of judicial proceedings maintained outside the courts. It simply does not follow from the fact that courts play a role in the "creat[ion]" of conviction records that it is "essential" that courts be able to eradicate those records.

Indeed, the extension of ancillary jurisdiction to motions not directly relevant to a district court's resolution of a criminal prosecution raises separation of powers and federalism concerns. As the Ninth Circuit concluded in <u>Sumner</u>, "the expungement of the record of a valid arrest and conviction usurps the powers that the framers of the Constitution allocated to Congress, the Executive, and the states. . . . In eliminating

the record of a conviction and arrest, expungement necessarily nullifies a law which Congress has properly enacted and which the Executive has successfully enforced." See 226 F.3d at 1014; see also Meyer, 439 F.3d at 862 ("For obvious and quite important reasons, Congress has recognized the critical nature of preserving criminal records and has specified the use and effect of certain criminal convictions. Allowing a district court to expunge criminal records based solely upon equitable considerations, without an express grant of authority from Congress, would undermine these goals.").

With regard to federalism, "when states have established professional standards that are affected by criminal records, expungement also trenches on their right to regulate employment within their borders." Sumner, 226 F.3d at 1014. Accordingly, "[a]bsent a clear statutory or historical basis, an article III court should not arrogate such power unto itself." Id. at 1015; accord Meyer, 439 F.3d at 862 (agreeing with Ninth Circuit that allowing ancillary jurisdiction over equitable expungement motions would "usurp" the framers' structure of separation of powers and federalism"). Likewise, in Lucido the court relied upon an expungement order's ability to "undermine a web of federal (and state) laws designed to collect and preserve" arrest and conviction information for "law enforcement

purposes." <u>See</u> 612 F.3d at 877.[11]  Thus, the <u>Lucido</u> court concluded that because of the wide-ranging consequences that extending ancillary jurisdiction to reach equitable expungement motions would have on "indictments and convictions that Congress . . . commanded the executive branch to preserve — it hardly seems unfair to insist that Congress, not a court's inherent equitable power, be the source of that authority." <u>Id.</u>

In short, equitable expungement motions do not satisfy the second <u>Kokkonen</u> criterion.  Expunging valid convictions on equitable grounds does not assist a court in "manag[ing] its proceedings, vindicat[ing] its authority, and effectuat[ing] its decrees." <u>Kokkonen</u>, 511 U.S. at 379-80.  To the contrary, expunging accurate records of valid convictions on equitable grounds potentially encroaches upon the prerogatives of the other branches of government and the states.

C.   The District Court Abused its Discretion in Granting Doe's Expungement Motion

Even assuming that the district court had ancillary jurisdiction to expunge Doe's criminal record, the court abused its discretion in granting the motion.  Both before and after <u>Kokkonen</u>, circuit courts that have recognized ancillary jurisdiction to expunge criminal records for equitable reasons

---

[11]   One such law is 28 U.S.C. § 534(a)(1), which requires the Attorney General of the United States to acquire, retain, and disseminate criminal records.

have limited the exercise of that authority to situations involving egregrious procedural improprieties, such as prosecutions based upon unconstitutional statutes, cases involving mass arrests without probable cause, or affirmative governmental misuse of arrest records. See, e.g., Tokoph, 774 F.3d at 1305-06 (equitable expungement authority extends to convictions that were "unconstitutional, illegal, or obtained through government misconduct") (citation omitted); United States v. Rowlands, 451 F.3d 173, 177 (3d Cir. 2006) (courts "have jurisdiction over petitions for expungement in certain narrow circumstances — namely, where the predicate for the expunction is a challenge to the validity of either the arrest or conviction.") (internal quotation marks omitted); Meyer, 439 F.3d at 861-62 ("A district court may have ancillary jurisdiction to expunge criminal records in extraordinary cases to preserve its ability to function successfully by enabling it to correct an injustice caused by an illegal or invalid criminal proceeding."); Sumner, 226 F.3d at 1014 (expungement authority extends to "unlawful arrest[s] or conviction[s]" or to "clerical error[s]"); Sealed Appellant, 130 F.3d at 699 (expungement of executive branch records permitted to remedy "civil rights violations"); Schnitzer, 567 F.2d at 539 (describing unusual circumstances that would justify exercise of the "narrow" power

of expungement). But these cases cannot be stretched so far as to condone the "judicial editing of history," <u>Rowlands</u>, 451 F.3d at 176 (quoting <u>Rogers v. Slaughter</u>, 469 F.2d 1084, 1085 (5th Cir. 1972)), in a case like Doe's that concerns a valid conviction that is not the product of governmental misconduct or an unconstitutional law.

In <u>Schnitzer</u>, this Court explained that "unusual or extreme" circumstances warranting expungement would arise in cases involving an abuse of power or an unconstitutional statute. See <u>Schnitzer</u>, 567 F.2d at 539-40 (quoting <u>United States v. Linn</u>, 513 F.2d 925, 927 (10th Cir. 1975)).

> Such extreme circumstances have been found and records ordered to be expunged where procedures of mass arrests rendered judicial determinations of probable cause impossible, where the court determined that the sole purpose of the arrests was to harass civil rights workers, where the police misused the police records to the detriment of the defendant, or where the arrest was proper but was based on a statute later declared unconstitutional.

<u>Id.</u> (internal citations omitted); <u>see also</u> <u>Linn</u>, 513 F.2d at 927 ("[W]here the arrest itself was an unlawful one, or where the arrest represented harassing action by the police, or where the statute under which the arrestee was prosecuted was itself unconstitutional, courts have ordered expunction. However, it would appear that an acquittal, standing alone, is not in itself sufficient to warrant an expunction of an arrest record."). The

sole authority concerning a conviction that this Court relied upon in describing the unusual circumstances that would justify expungement was Kowall v. United States, 53 F.R.D. 211 (W.D. Mich. 1971), where a district court expunged a conviction under the Selective Service Act after the United States Supreme Court declared administrative regulations promulgated under that act unconstitutional. See Schnitzer, 567 F.2d at 540.

The defendant in Schnitzer, this Court held, failed to qualify for the extraordinary relief of expungement relief because his circumstances were unexceptional: his "arrest and indictment were both legal, as was the law under which he was charged." Id. Moreover, that he would be required to explain his arrest in connection with his rabbinical studies was not "harsh or unique" because such "explanation[s] may be expected from those about to enter a profession." Id.; accord Tokoph, 774 F.3d at 1305-06 ("absent an allegation that the conviction was somehow invalid, Defendant's arguments that she had been punished enough are simply insufficient as a matter of law.") (quoting Pinto, 1 F.3d at 1070) (internal alteration and quotation marks omitted).

Accordingly, like other courts that have recognized narrow grounds upon which the extreme remedy of expungement can be granted, this Court in Schnitzer limited the scope of

district courts' expungement authority to situations involving violations of the defendant's rights. Such a prudential limitation was in keeping with federal courts' tradition of crafting appropriate remedies where a claimant "has demonstrated that his [or her] rights have been violated" and where "no other remedy existed to vindicate important legal rights." Sealed Appellant, 130 F.3d at 698-99 (citing Marbury v. Madison, 5 U.S. 137, 163 (1803), and United States v. McLeod, 385 F.2d 734, 750 (5th Cir. 1967)).

Indeed, in Peters v. Hobby, 349 U.S. 331 (1955), the Court held that a professor of medicine who had been found to be disloyal to the United States and debarred from federal employment was entitled to the "expunge[ment]" of executive branch records reflecting those determinations. Id. at 334-337, 348-49. This was so because the "Loyalty Review Board," which was established pursuant to Executive Order, had exceeded its jurisdiction when it chose to revisit and reverse two prior intra-agency decisions, which determined that allegations concerning the petitioner's loyalty to the United States were unfounded. See id. at 339-40. Because the Review Board had "failed to respect [the] limitations" imposed on its authority and "plainly" exceeded its authority under the Executive Order, the Court determined that expungement was appropriate. See id.

Here, in contrast, there has been no violation of the petitioner's rights. Instead, her difficulty in obtaining employment has been the result of an entirely valid conviction.

Judge Gleeson reasoned that the current policy of "seemingly automatic refusals by judges to expunge convictions when the inability to find employment is the 'only' ground for the application have undervalued the critical role employment plays in re-entry." Doe, 2015 WL at 2452613 at *6. There is, however, no authority for the proposition that expungement is available to a petitioner based upon adverse employment consequences alone. Tellingly, the only cases that the district court could cite that reached a contrary conclusion were those in which district courts granted the expungement of criminal convictions that had already been "set aside" under the now-repealed Federal Youth Corrections Act ("FYCA"), 18 U.S.C. § 5005 et seq. See Doe, 2015 WL 2452613 at *5 & n.20-21 (citing United States v. Doe, 935 F. Supp. 478, 480-81 (S.D.N.Y. 1996) (Chin, J.) ("Doe I") and United States v. Doe, No. 710-CR-892 (CBM), 2004 WL 1124687, at *2 (S.D.N.Y. May 20, 2004) ("Doe II").

In Doe I, Judge Chin explained the "most important" factor warranting expungement was that the defendant's conviction had been set aside, following his successful

completion of probation, under the FYCA. <u>See</u> 935 F. Supp. at 481.[12] The court reasoned that expungement would further Congress's express purpose in enacting the set-aside provision of the FYCA, which was to relieve youthful offenders of the "usual disabilities of a criminal conviction" and to give them "a second chance free of a record tainted by such a conviction." <u>Id.</u> (citation omitted). This was because, "[w]ithout expunction . . . [the] decision to set aside [the] defendant's conviction would be rendered essentially meaningless." <u>Id.</u>; <u>see also</u> <u>Doe II</u>, 2004 WL at 1124687, at *3 (relying on <u>Doe I</u> and concluding that the petitioner's having been convicted under the YCA favored expungement).

Doe I and Doe II are easily distinguishable from the present case. In both cases the main factor warranting expungement was that the petitioners were convicted under a statute that expressly permitted the "setting aside" of their convictions. Indeed, in <u>Sealed Appellant</u>, the Fifth Circuit explained that decisions expunging executive branch records of

---

[12] The relevant portion of the FYCA provided that "where a youth offender has been placed on probation by the court, the court may thereafter, in its discretion, unconditionally discharge such youth offender from probation prior to the expiration of the maximum period of probation theretofore fixed by the court, which discharge shall automatically set aside the conviction, and the court shall issue the to the youth offender a certificate to that effect." <u>See</u> <u>Doe II</u>, 2004 WL 1124687, at *1 n.2 (quoting former 18 U.S.C. § 5021(b)).

FYCA convictions relied not upon "a general amorphous right to expunge, but [upon] specific statutory provisions granting a right that could be effected only by the Court's use of that remedy." 130 F.3d at 700; accord Livingston, 759 F.2d at 78.[13] Here, of course, no similar statute implicitly authorizes any such equitable expungement. See Lucido, 612 F.3d at 875 (holding that the power to expunge criminal convictions implicates serious separation of powers consequences because the defendant wanted to remove records of indictments held by the FBI). Instead, Congress has passed statutes that require the Attorney General to retain records of convictions and that provide for expungement in limited narrowly-defined circumstances. See id. at 874, 877. Thus, the sort of separation-of-powers concerns that courts have repeatedly recognized as a significant factor counseling against the extension of ancillary jurisdiction to equitable expungement motions and that were not as readily apparent in Doe I and Doe II are squarely implicated here.

In the present case, Doe's conviction was lawful, and the only alleged harm Doe suffered was difficulty in maintaining

---

[13] The circuit courts do not uniformly agree that the remedy of expungement was implicitly authorized under the set-aside provision of the FYCA. See Tokoph, 774 F.3d at 1305 ("[T]he FYCA does not empower courts to expunge convictions"); accord United States v. Doe, 859 F.2d 1334, 1335-36 (8th Cir. 1988).

employment in the home health care industry. See Doe, 2015 WL 2452613 at *3. In the more than three decades after Schnitzer was decided, district courts in the Second Circuit — with the exception of those in Doe I and Doe II — uniformly decided that alleged adverse employment consequences were insufficient to warrant equitable expungement. See, e.g., United States v. Barrow, No. 06 Cr. 1084 (JFK), 2014 WL 2011689, at *3 (S.D.N.Y. May 16, 2014) (quoting Schnitzer, 567 F.2d at 540) (holding that impeded education and employment progress "'does not fall within the narrow bounds of the class of cases where expungement has been declared appropriate.'"); Joefield v. United States, No. 13 MC 367 (JBW), 2013 WL 3972650, at *5 (E.D.N.Y. Aug. 5, 2013) (holding that the petitioner's concern that her valid conviction would hinder her prospects for obtaining employment as a correction officer was an insufficient basis for relief).

Furthermore, the Seventh and Ninth Circuits both have held that district courts abused their discretion in expunging criminal records based solely upon actual or threatened adverse employment actions. In the pre-Kokkonen case of United States v. Smith, 940 F.2d 395 (9th Cir. 1991), the Ninth Circuit held that the defendant's "clean background," the minor nature of his offenses, successful completion of probation, and decision to seek expungement so that he could reenlist in the U.S. Army were

insufficient to warrant the district court's exercise of its equitable expunction authority.  See id. at 395-96.  Like this Court in Schnitzer, the Ninth Circuit recognized the district court's "narrow" equitable power to expunge convictions in "extreme circumstances."  Id. at 396.  In applying this standard, the court held the district court did not properly use its power to alleviate the alleged harms of "disbarment and a possible prohibition against reenlistment" because those were not "unusual or unwarranted. . . . [i]nstead, they are the natural and intended collateral consequences of having been convicted."  Id.  Importantly, the court reasoned that "[w]ere we to deem [the alleged harms] sufficient to outweigh the government's interest in maintaining criminal records, expunction would no longer be the narrow, extraordinary exception, but a generally available remedy."  Id.  And, as the Ninth Circuit subsequently explained in Sumner, such extreme circumstances necessary to warrant expungement are an "unlawful arrest or conviction" or a "clerical error."  See 226 F.3d at 1014.

Likewise, in Flowers, the Seventh Circuit held that "granting expungement" was "an abuse of the district court's discretion" because the case "concern[ed] no more than a routine, valid criminal conviction with the usual attendant

consequences." See 389 F.3d at 740. There, the court rejected the defendant's fears of limited employment prospects as a harm sufficient to warrant expungement because the "'unwarranted adverse consequences'" needed to outweigh the government's interest in maintaining accurate records of convictions "must truly be extraordinary." Id. at 739. As an example of such "truly extraordinary" circumstances, the Court cited the baseless arrests of civil rights workers that were the subject of a successful motion in United States v. McLeod, 385 F.2d 734, 741 (5th Cir. 1967). See Flowers, 389 F.3d at 740.

Here, however, there is nothing "extraordinary" about Doe's lawful conviction or her employment record. Because Doe's conviction was valid, the district court abused its discretion when it expunged the executive and judicial records of that conviction based principally upon her employment difficulties and efforts at rehabilitation.

CONCLUSION

For the reasons stated, the order of the district court should be reversed.

Dated:      Brooklyn, New York
            September 18, 2015

                              Respectfully submitted,

                              KELLY T. CURRIE,
                              Acting U.S. Attorney,
                              Eastern District of New York.

                    By:     _____/s/_____
                              BRADLEY T. KING
                              Assistant U.S. Attorney

DAVID C. JAMES,
BRADLEY T. KING,
Assistant United States Attorneys,
    (Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 8,668 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated:     Brooklyn, New York
           September 18, 2015

                              _____/s/_____
                              David C. James
                              Assistant U.S. Attorney

A P P E N D I X

TABLE OF CONTENTS

Page

District Court Docket Sheet
  (Unsealed Portions)........................................GA  1

District Court's Memorandum and Order,
  Dated May 21, 2015......................................GA  4

Notice of Appeal, dated June 19, 2015.....................GA 17

Government's Letter to District Court,
  Dated June 23, 2015.....................................GA 19

APPEAL,IFP,NPROSE

**U.S. District Court**
**Eastern District of New York (Brooklyn)**
**CIVIL DOCKET FOR CASE #: 1:14-mc-01412-JG**

Jane Doe 14 MC 1412 v. United States of America          Date Filed: 10/30/2014
Assigned to: Judge John Gleeson

<u>Petitioner</u>

**Jane Doe 14 MC 1412**                    represented by   **Bernard H. Udell**
                                                            26 Court Street
                                                            Brooklyn, Ny
                                                            Brooklyn, NY 11242
                                                            (718)596-2410
                                                            Fax: (718)596-2380
                                                            Email: bhudell@yahoo.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

V.

<u>Respondent</u>

**United States of America**                represented by   **Bradley T. King**
                                                            U.S. Attorney's Office
                                                            Eastern District Of New York
                                                            271 Cadman Plaza East
                                                            Brooklyn, NY 11201
                                                            718-254-6435
                                                            Fax: 718-254-6076
                                                            Email: bradley.king@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/21/2015 | 9 | ORDER granting 1 Motion to Expunge. For the reasons set for in the attached memorandum and order 9 , the motion to expunge is granted. Ordered by Judge John Gleeson on 5/21/2015. (Garcia, Lynda) (Entered: 05/21/2015) |
| 05/22/2015 | | ORDER. I have been asked by the Clerk's office to enter the following additional order to effectuate the Court's intent: "(1) all references to Doe's conviction for the offense charged in *USA v. Lucien*, No. 00-CR-1274, and to the institution of criminal proceedings against her in *Lucien* shall be expunged from all public records; (2) because *Lucien* is a multi-defendant case, the entire matter shall be sealed; and (3) this Order shall be filed under seal except that it shall be unsealed for the sole purpose of transmitting the order to the United States Marshal (and other law enforcement authorities, if any) and to that |

| | | |
|---|---|---|
| | | limited extent only." The parties are invited, if they wish, to comment on this; any comments related to this or the invitiation in the memorandum and order 9 for input relating to the relief granted shall be filed on or before June 5, 2015. Ordered by Judge John Gleeson on 5/22/2015. (Garcia, Lynda) (Entered: 05/22/2015) |
| 05/29/2015 | 10 | Letter to Judge Gleeson dated 5/22/2015 from Bernard H. Udell. (Priftakis, Tina) (Entered: 05/29/2015) |
| 06/05/2015 | 11 | Letter *Concerning the Government's Request for an Extension of Time, Unsealing and Clarification of the Record* by United States of America (King, Bradley) (Entered: 06/05/2015) |
| 06/08/2015 | 12 | ORDER. See the attached order 12 granting the government's request for an extension of time and addressing the other applications in its June 5, 2015 letter 11 . Ordered by Judge John Gleeson on 6/8/2015. (Garcia, Lynda) (Entered: 06/08/2015) |
| 06/09/2015 | | ORDER. Michael Tremonte and Emily Burgess are appointed as pro bono co-counsel for Jane Doe. The Clerk and Probation Department are respectfully directed to afford them access to the court records and probation file. Ordered by Judge John Gleeson on 6/9/2015. (Garcia, Lynda) (Entered: 06/09/2015) |
| 06/19/2015 | 13 | NOTICE OF APPEAL by United States of America. Appeal Record due by 7/3/2015. (King, Bradley) (Entered: 06/19/2015) |
| 06/19/2015 | 14 | NOTICE OF APPEAL by United States of America. Appeal Record due by 7/3/2015. (King, Bradley) (Entered: 06/19/2015) |
| 06/19/2015 | | Electronic Index to Record on Appeal sent to US Court of Appeals. 14 Notice of Appeal Documents are available via Pacer. For docket entries without a hyperlink or for documents under seal, contact the court and we'll arrange for the document(s) to be made available to you. (McGee, Mary Ann) (Entered: 06/19/2015) |
| 06/23/2015 | 15 | Letter *Regarding the Government's Filing of a Notice of Appeal on June 19, 2015* by United States of America (King, Bradley) (Entered: 06/23/2015) |
| 06/24/2015 | | ORDER. The government's application in its letter dated June 23, 2015 [DE 15], requesting an opportunity to address the scope of the order and its implementation in the event the appeal is withdrawn, is granted. Assuming the correctness of the government's assertion that I lack subject matter jurisdiction (even concerning the form of the remedial order), I respectfully suggest that the government bring any concerns with regard to the order to the Court's attention, even while the appeal is pending. At the very least, it would afford this Court the opportunity to provide the Court of Appeals its view regarding the issues raised. Ordered by Judge John Gleeson on 6/24/2015. (Garcia, Lynda) (Entered: 06/24/2015) |
| 06/29/2015 | | Email Notification Test - DO NOT REPLY. (Brucella, Michelle) (Entered: 06/29/2015) |

Case 15-1967, Document 31, 09/18/2015, 1602308, Page57 of 74
GA03

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/10/2015 15:42:24 | | |
| **PACER Login:** | DavidJames:2725349:4299065 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:14-mc-01412-JG |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

Westlaw.

Page 1

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Jane DOE, Petitioner,
v.
UNITED STATES of AMERICA, Respondent.

No. 14–MC–1412 (JG).
Signed May 21, 2015.

**Background:** Petitioner sought expungement of 13-year-old healthcare fraud conviction.

**Holdings:** The District Court, John Gleeson, J., held that:

(1) court possessed ancillary jurisdiction to hear expungement claim based on equitable considerations, and

(2) extraordinary circumstances warranted expungement.

Ordered accordingly.

West Headnotes

**[1] Criminal Law 110 ⬅1226(3.1)**

110 Criminal Law
   110XXVIII Criminal Records
      110k1226 In General
         110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
            110k1226(3.1) k. In General. Most
Cited Cases
      On a case-by-case basis, expungement lies within the equitable discretion of the court.

**[2] Criminal Law 110 ⬅1226(3.1)**

110 Criminal Law
   110XXVIII Criminal Records
      110k1226 In General
         110k1226(3) Expungement or Correction;

Effect of Acquittal or Dismissal
            110k1226(3.1) k. In General. Most
Cited Cases

**Criminal Law 110 ⬅1226(4)**

110 Criminal Law
   110XXVIII Criminal Records
      110k1226 In General
         110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
            110k1226(4) k. Arrest Records. Most
Cited Cases
      A request for expungement is usually granted only in extreme circumstances after examining it individually on its merits to determine the proper balancing of the equities; specifically, the government's need to maintain arrest records must be balanced against the harm that the records can cause citizens.

**[3] Federal Courts 170B ⬅2542**

170B Federal Courts
   170BVIII Jurisdiction of Entire Controversy;
Pendent and Supplemental Jurisdiction
      170Bk2542 k. Ancillary and Incidental Jurisdiction in General. Most Cited Cases
      Ancillary jurisdiction allows federal courts to hear some matters otherwise beyond their competence that are incidental to other matters properly before them.

**[4] Criminal Law 110 ⬅1226(3.1)**

110 Criminal Law
   110XXVIII Criminal Records
      110k1226 In General
         110k1226(3) Expungement or Correction;
Effect of Acquittal or Dismissal
            110k1226(3.1) k. In General. Most
Cited Cases

**Federal Courts 170B ⬅2552**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

170B Federal Courts
   170BVIII Jurisdiction of Entire Controversy; Pendent and Supplemental Jurisdiction
      170Bk2551 Particular Motions or Proceedings
         170Bk2552 k. In General. Most Cited
      Court possessed ancillary jurisdiction to hear petitioner's claim for expungement of her criminal record following a valid conviction based on equitable considerations; determining appropriateness of expunging court records was essential to conducting federal-court business.

**[5] Criminal Law 110 €═1226(3.1)**

110 Criminal Law
   110XXVIII Criminal Records
      110k1226 In General
         110k1226(3) Expungement or Correction; Effect of Acquittal or Dismissal
            110k1226(3.1) k. In General. Most Cited Cases
      Extraordinary circumstances warranted expungement of petitioner's criminal record following valid conviction for healthcare fraud, and in absence of government misconduct, where petitioner had committed offense 17 years prior, was sentenced 13 years prior, had never been rearrested, demonstrated dramatic adverse effect on her ability to maintain employment, had strong desire to work, and fraud conviction was unrelated to healthcare field in which she sought employment.

Bernard H. Udell, Brooklyn, NY, for Petitioner.

Kelly T. Currie, Acting United States Attorney, Eastern District of New York, by: Bradley T. King, Brooklyn, NY, for Respondent.

*MEMORANDUM AND ORDER*

JOHN GLEESON, District Judge:
   **\*1** Jane Doe filed an application on October 30, 2014, asking me to expunge her thirteen-year old fraud conviction because of the undue hardship it

has created for her in getting—and especially keeping—jobs. Doe gets hired to fill home health aide and similar positions only to be fired when her employers learn through subsequent background checks about her conviction. Since the conviction was for health care fraud, it's hard to blame those employers for using the conviction as a proxy for Doe's unsuitability.

However, even if one believes, as I do, that employers are generally entitled to know about the past convictions of job applicants, and that their decisions based on those convictions are entitled to deference, there will nevertheless be cases in which all reasonable employers would conclude that the conviction is no longer a meaningful consideration in determining suitability for employment if only they had the time and the resources to conduct a thorough investigation of the applicant or employee.

I have conducted such an investigation, and this is one of those cases. In addition to presiding over the trial in Doe's case and her subsequent sentencing, I have reviewed every page of the extensive file that was created during her five years under probation supervision. I conclude that the public's interest in Doe being a productive, law-abiding member of society so far outweighs its interest in her conviction being a matter of public record that the motion is granted and her conviction is expunged.

FACTS
A. *Doe's Background and Crime*
   Doe was born and raised in Port–au–Prince, Haiti. In 1983, at age 24, she came to New York in search of a better life. She became a naturalized citizen in 1989. By 1990 she had three children from a relationship with a taxi driver who in that year left the family to return to Haiti. Doe's mother had come from Haiti in 1988 to help with the children, but she died in 1995. Another relationship ended prior to the birth of Doe's fourth child in 1996.

Doe enrolled in a nursing assistant program and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
(Cite as: 2015 WL 2452613 (E.D.N.Y.))

became a home health aide. By 1997, when she first became involved in the criminal conduct that gave rise to her conviction, Doe's children were ages 12, 10, 7, and 1. She was raising them by herself on her net monthly income of $783. They lived in a two-bedroom apartment on the first floor of a six-story building in the Jamaica section of Queens. The monthly rent exceeded Doe's take-home pay. After visiting the home as part of the presentence investigation, a probation officer reported that crack dealers and crack addicts frequented the entrance to the building and its lobby.

In those circumstances, Doe participated in 1997 in one of the automobile insurance fraud schemes that were ubiquitous in this district at the time. The schemes involved, among other criminal participants: corrupt physicians and other health care professionals at clinics; organizers of staged car "accidents" (who were usually principals of car service businesses); drivers of livery cars, who would deliberately cause minor collisions; and people like Doe, who would climb into the back seat of a car before the staged collisions. A car full of passengers would be deliberately driven into an innocent motorist's car at low speed, often when the latter car was stopped at a light. A police officer was summoned, producing a police report, and the passengers would feign injuries. They were taken to a clinic, where they signed over their rights to no-fault insurance benefits to the clinic. The clinic would then bill the insurance companies for unnecessary (and usually unperformed) services, up to the $50,000 limit. The corrupt clinics would pay the car service operators for each "patient" they provided, the driver would get a fee (usually $500) for causing the "accident," and the passengers in the back of the car would sometimes get a small cash payment. In addition, the phony treatment files generated by the clinics for each of the (uninjured) passengers would sometimes become the basis of particularly audacious personal injury lawsuits. Specifically, the passengers would be referred to lawyers who would bring suits on their behalf against the innocent drivers of the other cars. Of course those suits were entirely meritless (a fact the lawyers sometimes were aware of, and sometimes not), but they could be settled for their nuisance value.

*2 On August 1, 1997, Doe agreed to be involved in one of these staged accidents. She was one of the passengers in the back seat, and she falsely claimed that she was injured, assigned her no-fault insurance claim to a clinic, and represented that she had received medical services related to her fabricated injury. A civil claim was filed on her behalf, which was settled, and Doe received $2,500. [FN1] In 2001, Doe was found guilty after a jury trial of violating 18 U.S.C. § 1347 based on her role in the scheme. She was sentenced on March 25, 2002 to five years' probation, ten months of home detention, and a restitution order of $46,701. She had no prior criminal history, and she has not had any contact with the criminal justice system since her conviction.

B. *Doe's Employment Problems While on Probation and Afterward*

I have carefully reviewed the Probation Department's files on Jane Doe. They memorialize the five years she spent under supervision. The two files total almost 1,000 pages. They paint a portrait of a woman who (1) needs to work to support the four young children she was raising by herself at the time; (2) wants very much to work; (3) detests being on public assistance; and (4) poses no risk of financial harm to others. Along with the facts advanced in support of the instant motion, the probation files also show that during the 13 years since Doe was sentenced, her conviction has become an increasingly insurmountable barrier to her ability to work.

Early in her five-year probationary period, Doe got a job as a "house manager" at Agency One,[FN2] a homeless shelter for women with children. It was not fulltime work, but the combination of her wages from that job, her public assistance, and food stamps equaled approximately $1,300 per month. Doe was laid off from that job in July 2003, appar-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

ently for reasons unrelated to her conviction.

Doe actively began looking for other work, and in March 2004 she began working as a counselor at Agency Two, a home for families with children with mental disabilities. The probation officer noted on May 21, 2004 that Doe's supervisor was unaware of her conviction. Even with the job at Agency Two, Doe's total monthly income was less than $1,000. At that time her children were ages 17, 16, 13, and 7.

Despite her dire financial circumstances, Doe was intent on keeping up with her restitution obligation. I had ordered her to pay $25 per month. The October 2004 notes in the file state that she was actually two months *ahead* in her payments, explaining that "[t]hough she occasionally misses a payment, she doubles the payment the following month," and she apparently doubled her payment on two more occasions than she needed to.

By September 2004, for reasons not set forth in the file, Doe was back on public assistance. In December of that year she landed a part-time job as a relief counselor at Agency Three, a home for persons with mental illnesses and developmental disabilities. The job paid $10 per hour, but the hours were so low that Doe's total monthly income (including food stamps) hovered around $600 for three months. When her hours spiked in May 2005 she had the best month by far of the entire five years of probation, earning $2,248, and she promptly sent $740 of it to her three siblings in Haiti. In June and July her hours declined, as did her net income, to $1,008 and $1,120, respectively, and by August she was back on public assistance. [FN3]

*3 A September 14, 2005 note states that Doe reported to her probation officer that she had just gotten a new job. But the job went away, and a two-page handwritten note from Doe to the officer explained what had happened:

The problem right now. Any placed you fill any application for job you supposed to make fingerprint and background checked. For me, this is the problem. I've applied so many places to work. Everything is O.K. When people calling you for an interview, I fail because fingerprint and criminal background checked came back. People said I'm very sorry for you. I can't hired you because criminal background checked and fingerprint. I'm a patient woman I'm still going to looking for different placed or private duties to do.... [FN4]

Doe kept looking for work and found it at Agency Four, a home for the elderly. The position was not only low-paying (Doe's monthly income for the five months she worked there never reached $1,000), but the employer would not allow Doe to take the time needed to see her doctor for a thyroid condition. As a result, she switched to Agency Five in May 2006. Agency Five is a home health care provider.

The move to Agency Five brought with it the risk of a fingerprint check, and that risk materialized two months later. Doe was fired on July 24, 2006, when her conviction came to light.

The probation officer's report covering July 2006 still has a yellow Post–It note stuck to it. On the note is the following plea from Doe:

[C]an't you please talk to the judge about my situation, criminal record. If the judge can't release my problem one day I'm going to find work somewhere. I'm good hardworking woman, I'm single parent, have 4 childrens. I don't like welfare I like to work. I'm independence woman please explain to judge for me.

The report for August 2006 includes Doe's statement that "right now I'm not working because criminal record."

In October of that year, Doe reported in writing to her probation officer as follows: "When I'm looking for job the criminal background give me a problem. No job for me nowhere? Very sadness."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

Doe's file reveals that she remained unemployed until her probation was terminated on March 24, 2007. Since then the pattern has continued. Specifically, Doe's conviction does not prevent her from getting jobs as a home health care worker, but it has consistently prevented her from keeping those jobs. She doesn't lie to her employers, who do not ask her if she has a criminal record at the hiring stage. However, after she gets jobs, record checks are performed by her employers or others acting on their behalf. Once they learn of Doe's conviction, she gets fired. This has happened to her half a dozen times.

The government does not dispute any of the foregoing facts. Rather, it contends in opposition to the motion that Doe's employment difficulties do not amount to the extreme circumstances necessary to warrant expungement.

DISCUSSION

*4 A conviction for even a minor federal felony can have wide-ranging effects on, among other things, a defendant's employment, housing, and educational opportunities. Those effects sometimes "impose additional burdens on people who have served their sentences ... without increasing public safety in essential ways." FN5 And "research reveals that gainful employment and stable housing are key factors that enable people with criminal convictions to avoid future arrests and incarceration." FN6 Simply put, the public safety is better served when people with criminal convictions are able to participate as productive members of society by working and paying taxes.

A criminal record poses an especially high barrier to employment. Nearly seventy percent of U.S. employers now perform some form of criminal background check on prospective employees.FN7 A criminal record exacerbates the increased difficulty that older workers like Doe already face in the job market.FN8 Those difficulties are further exacerbated by race. Doe is black, and studies show that her race is even more of an impediment to her employment prospects than her conviction.FN9

The growing concern in recent years about the collateral consequences of criminal records has prompted various efforts to address how the criminal justice system can better balance its law enforcement goals with society's interest in the successful rehabilitation and reentry of individuals with criminal convictions.FN10 For example, in 2011, Attorney General Eric Holder called on the states to review the more than 38,000 statutes and regulations that impose collateral consequences and to eliminate those that do nothing to increase public safety. FN11 In 2014, Chief Judge Jonathan Lippman of the New York Court of Appeals proposed a measure that would allow nonviolent felons to have their records sealed if they avoid re-arrest for ten years and have no prior felony convictions.FN12 Two bills that would create federal expungement authority for nonviolent offenses have been introduced in recent years, although neither advanced to a floor vote. FN13 Delaware Governor Jack Markell has used his pardon power in an effort to alleviate the stigma of criminal records and to help deserving individuals secure employment, signing almost 1,600 pardons, primarily for people convicted of minor offenses, in his six-plus years in office.FN14 Thus, commendable systemic efforts to correct the long-lasting and often disproportionate consequences of criminal convictions are under way.

[1][2][3][4] In the meantime, on a case-by-case basis, "expungement lies within the equitable discretion of the court[.]" FN15 District courts in this and certain other circuits have ancillary jurisdiction over applications for orders expunging convictions. FN16 A request for expungement is "usually is granted only in extreme circumstances" after examining it "individually on its merits to determine the proper balancing of the equities." FN17 Specifically, "the government's need to maintain arrest records must be balanced against the harm" that the records can cause citizens.FN18

*5 Doe seeks the expungement of a valid conviction, not a suspect arrest, and I am acutely aware that "courts have rarely granted motions to expunge

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

arrest records, let alone conviction records." [FN19] Nevertheless, courts have granted such requests even where the conviction is valid and no government misconduct was involved as long as sufficiently extraordinary circumstances are present. [FN20]

[5] This case presents extraordinary circumstances sufficient to warrant expungement. First, Doe's offense of conviction "is distant in time and nature from [her] present life." [FN21] Doe committed the offense 17 years ago, was sentenced 13 years ago, and completed her five-year sentence of probation eight years ago. She has not even been re-arrested, let alone convicted, in all those years.

Second, Doe has shown that her criminal record has had a dramatic adverse impact on her ability to work. [FN22] She has been terminated from half a dozen jobs because of the record of her conviction. These consequences are compounded in Doe's case by her age and her race. Indeed, given the well-established fact that recidivism rates decline as age increases, [FN23] Doe's age alone counsels in favor of expunging her conviction. That she has not engaged in any criminal activity since the conduct that brought her before me helps to prove that point; a long period of law-abiding conduct after a conviction lowers the risk of recidivism to the same level as someone who has never committed a crime. [FN24]

Doe was a minor participant in a nonviolent crime. As the Supreme Court has made clear, while prison terms are qualitatively more severe, Doe's five-year term of probation was serious punishment. [FN25] Moreover, intermediate sanctions, like the ten-month period of home detention with electronic monitoring I imposed upon Doe, can inflict meaningful additional punishment without risking the loss of a defendant's children to foster care. Anyone who is not persuaded that home detention is real punishment need only review the section of Doe's probation file that is devoted to the home confinement condition. [FN26]

The government's main arguments against expungement are that Doe's circumstances are not sufficiently extreme and that it is entirely appropriate for employers in the health care field to have knowledge of her conviction of health care fraud. [FN27] As for the first argument, there is a growing recognition that the adverse employment consequences of old convictions are excessive and counterproductive. Doe's criminal record has prevented her from working, paying taxes, and caring for her family, and it poses a constant threat to her ability to remain a law-abiding member of society. It has forced her to rely on public assistance when she has the desire and the ability to work. Nearly two decades have passed since her minor, nonviolent offense. There is no justification for continuing to impose this disability on her. I sentenced her to five years of probation supervision, not to a lifetime of unemployment.

*6 The government's second argument, *i.e.,* that Doe's health care fraud conviction should not be expunged because she seeks employment in the health care field, has obvious superficial appeal. Indeed, if Doe's conviction had arisen out of her work as a home health aide, the outcome of this application might well have been different. But facts matter, and the facts here are that a young woman raising four children by herself on wages that did not even cover the rent availed herself of an opportunity to make $2,500 illegally. That the scheme offered to her resulted in health care fraud was essentially fortuitous. In her circumstances at the time, Doe would have participated in any scheme to make ends meet. There was no specter at the time that she had used her training as a home health aide to help commit or cover up her crime. There is no specter now that she poses a heightened risk to prospective employers in the health care field.

Finally, there is something random and senseless about the suggestion that Doe's ancient and minor offense should disqualify her from work as a home health aide. The patchwork quilt of collateral consequences mentioned above produces results

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

that are so anomalous they border on the farcical. For example, a conviction for even a minor crime can result in disqualifying a person from being a barber in New York.[FN28] Yet last year the IRS recertified a tax preparer despite its knowledge of his recent felony conviction in my courtroom for preparing a fraudulent tax return for a major drug trafficker.[FN29] In that case, the United States Attorney urged me to allow the defendant to continue to work as a tax preparer without any notice to his clients of his recent conviction for being a fraudulent tax preparer. The government's assertion in this case that the public interest requires home health care agencies to know about Doe's minor criminal conduct in 1997 thus rings somewhat hollow.

CONCLUSION

Doe is one of 65 million Americans who have a criminal record and suffer the adverse consequences that result from such a record. Her case highlights the need to take a fresh look at policies that shut people out from the social, economic, and educational opportunities they desperately need in order to reenter society successfully.

The seemingly automatic refusals by judges to expunge convictions when the inability to find employment is the "only" ground for the application have undervalued the critical role employment plays in re-entry. They are also increasingly out of step with public opinion. The so-called "ban the box" practice, in which job applications no longer ask the applicant whether he or she has been convicted of a crime, is becoming more prevalent.[FN30] There is an increasing awareness that continuing to marginalize people like Doe does much more harm than good to our communities.

Accordingly, Doe's application for an order expunging her conviction is granted. It is hereby ordered that the government's arrest and conviction records, and any other documents relating to this case, be placed in a separate storage facility, and that any electronic copies of these records or documents and references to them be deleted from the government's databases, electronic filing systems,

and public record. Doe's real name is to be removed from any official index or public record. It is further ordered that the records are not to be opened other than in the course of a bona fide criminal investigation by law enforcement authorities and only when necessary for such an investigation. The government and any of its agents may not use these records for any other purpose, nor may their contents be disseminated to anyone, public or private, for any other purpose.

*7 Finally with respect to the relief granted here, I welcome the input of the parties. My intention is clear: no inquiry of the federal or state government by a prospective employer should result in the disclosure of Doe's conviction. Effectuating that intent without unduly burdening those governments or impairing their legitimate law enforcement interests is not so clear, at least not to me. Thus I welcome any proposed modifications to the relief set forth above, and of course any such proposals by the government would not be regarded as a waiver of its opposition to my decision to expunge the conviction.

So ordered.

FN1. The presentence report (at ¶ 16) asserts that Doe received payments for fraudulent medical expenses totaling $31,201.80, but that money went to the clinic to which Doe had assigned her right to no-fault benefits, not to Doe herself. Thus, those funds were properly included in Doe's loss calculation under the Guidelines, but they do not represent her gain from her offense. Rather, the trial record establishes that Doe received a $4,000 payment to settle her lawsuit, of which Doe got $2,500. Trial Tr. at 20, 950, 958. (In this respect the trial record contradicts the suggestion in paragraph 16 of the presentence report that Doe received $15,500 in settlement funds from that accident.) In addition, the government put on evidence at trial of uncharged and al-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

legedly staged accidents involving Doe and two of her children on November 10, 1998, May 9, 2000, and October 23, 2000.

FN2. In an effort to preserve confidentiality, the agencies will not be referred to by their real names.

FN3. Again, the file does not reveal whether this was one of the jobs from which Doe was fired after her conviction was discovered.

FN4. The text of the note is reprinted here exactly as it was written. I note that English is not Doe's native language, and she learned English as her second language only after immigrating to the United States.

FN5. Letter from Attorney General Eric Holder to State Governors (Apr. 18, 2011) ("Holder Letter"), *available at* http:// csgjusticecenter.org/wp-content/uploads/2014/02/Reentry_Council_AG_Letter.pdf.

FN6. *Id.* at 2.

FN7. *SHRM Survey Findings: Background Checking—The Use of Criminal Background Checks in Hiring Decisions,* Society for Human Resource Management (Jul. 19, 2012), *available at* http:// www.shrm.org/research/surveyfindings/articles/pages/creditbackgroundchecks.aspx (follow "click here" link).

FN8. *See* Maria Heidkamp et al., NTAR Leadership Ctr., Dep't of Labor, *The Public Workforce System: Serving Older Job Seekers and the Disability Implications of an Aging Workforce* 6–9 (May 2012), *available at* http:// www.dol.gov/odep/pdf/NTAR_Public_Workforce_System_Report_Final.pdf (discussing how older workers who lose a

job have a more difficult time than their younger counterparts in reconnecting to the labor market).

FN9. *See* James B. Jacobs, *The Eternal Criminal Record* 279–80 (Harvard Univ. Press 2015) (discussing sociologists Richard D. Schwartz and Jerome Skolnick's study finding that a criminal conviction produces "status degradation" with potentially permanent effects, and sociologist Devah Pager's more recent study finding that fictitious job applicants who were white with a criminal conviction were more likely to receive interest from employers than black applicants with *no* criminal conviction).

FN10. This concern stems from the rise in arrests and incarceration the last few decades that have left millions of people with a criminal record. An estimated 65 million Americans have a criminal record and thus face significant barriers to employment. *See* Michelle Natividad Rodriguez & Maurice Emsellman, Nat'l Employment Law Project, *65 Million "Need Not Apply": The Case for Reforming Criminal Background Checks for Employment* 3 (Mar.2011), *available at* https://www.nelp.org/content/uploads/2015/03/65_Million_Need_Not_Apply.pdf.

FN11. Holder Letter at 2. The Department of Justice's National Institute of Justice ("NIJ") funded a comprehensive study of collateral consequences by the ABA Criminal Justice Section, and launched a website in September 2012 that inventories the more than 38,000 collateral consequences of criminal records in the country. *See* ABA National Inventory of Collateral Consequences of Conviction ("NICCC"), http:// www.abacollateralconsequences.org/map/.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

Page 9

FN12. *See* Robert Gavin, *Lippman: Expunge Non–Violent Convictions,* Times Union, February 11, 2014, *available at* http:// www.timesunion.com/local/article/Lippman–Expunge–non–violent–convictions–5223 958.php# page–1; *see also* OCA 2014–98R, *available at* http:// newyork– sealinglaw.com/wp–content/uploads/2014/03/ OCA_2014–98R.pdf (providing the language of the proposed bill). In 2014, New York Senators Michael F. Nozzilio and Joseph R. Lentol introduced a bill similar to Chief Judge Lippman's proposal. *See* NYS S9607 (May 12, 2014) & NYS S7926 (July 7, 2014). The purpose of the bill was to:

... give certain past criminal offenders, i.e., nonviolent individuals whose criminal conduct was so far in the past as to make them statistically no more likely to commit future crime than any other person, a means by which to have their criminal record sealed from public view and thereby to relieve them of some of the economic and social stigma that generally attaches to criminal offenders even after their debts to the community have been paid.

N.Y.S. Senate Introducer's Memorandum in Support of S7926 (July 7, 2014), *available at* http:// tp://public.leginfo.state.ny.us (search query: "Bill No.," "A09607," "2014," "Sponsor's Memo"); OCA 2014–98R.

FN13. In 2011, Rep. Charles B. Rangel introduced the Second Chance for Ex–Offenders Act of 2011, H.R. 2449, 112th Cong., and Rep. Steve Cohen introduced the Fresh Start Act of 2011, H.R.2065, 112th Cong. Both bills provided for expungement of nonviolent offenses,

whether misdemeanors or felonies, for first-time offenders. *See* Summaries for the Second Chance for Ex–Offenders Act of 2011, *available at* https:// www.govtrack.us/congress/bills/112/hr206 5/summary; H.R. 2449—Fresh Start Act of 2011, *available at* https://www.congress.gov/bill/112th-congres s/house-bill/2449.

FN14. Cris Barrish & Jonathan Starkey, *Dramatic Rise in Pardons in Delaware,* News Journal, April 25, 2015, available at http:// www.delawareonline.com/story/news/local / 2015/04/25/dramatic-rise-pardons-delawar e/26374339/.

FN15. *United States v. Schnitzer,* 567 F.2d 536, 539 (2d Cir.1977), *cert. denied,* 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978).

FN16. *Id.* at 538 (citing cases). In 1994, the Supreme Court limited ancillary jurisdiction of collateral proceedings to instances where it is necessary "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent," and "(2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 379–80, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Ancillary jurisdiction allows federal courts to hear "some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Id.* at 378, 114 S.Ct. 1673. The federal courts of appeals seem to agree that district courts have ancillary jurisdiction to expunge records of unlawful convictions or arrests. *See* 13 Charles Alan Wright et al., *Federal*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

Page 10

*Practice & Procedure* § 3523.2 (3d ed.2008). They disagree, however, with respect to whether district courts have ancillary jurisdiction where, as here, they are asked to expunge records of lawful convictions based on equitable considerations. *See id.* The Second, Fourth, Seventh, Tenth, and D.C. Circuits have held that district courts have subject matter jurisdiction over such applications. *Id.* (citing *United States v. Flowers,* 389 F.3d 737, 739 (7th Cir.2004); *Livingston v. U.S. Dep't of Justice,* 759 F.2d 74, 78 (D.C.Cir.1985); *Allen v. Webster,* 742 F.2d 153, 154–155 (4th Cir.1984); *Schnitzer,* 567 F.2d at 539; *United States v. Linn,* 513 F.2d 925, 927 (10th Cir.1975)). The First, Third, Sixth, Eighth, and Ninth Circuits have held otherwise since *Kokkonen. See United States v. Lucido,* 612 F.3d 871, 875–76 (6th Cir.2010); *United States v. Coloian,* 480 F.3d 47, 52 (1st Cir.2007); *United States v. Meyer,* 439 F.3d 855, 859–60 (8th Cir.2006); *United States v. Dunegan,* 251 F.3d 477, 480 (3d Cir.2001); *United States v. Sumner,* 226 F.3d 1005, 1014–15 (9th Cir.2000). District courts in the Fourth Circuit have also held that they lack ancillary jurisdiction to expunge records on equitable grounds despite the Circuit's holding in *Allen,* 742 F.2d 153. *See, e.g., United States v. Harris,* 847 F.Supp.2d 828, 831–835 (D.Md.2012); *United States v. Mitchell,* 683 F.Supp.2d 427, 430 (E.D.Va.2010).

The government has not challenged my jurisdiction to decide Doe's application, but that does not relieve me of my obligation to ensure that such jurisdiction exists. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). I conclude that it does. As mentioned above, *Kokkonen* acknowledged federal courts' ancillary jur-

isdiction over proceedings that "enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." 511 U.S. at 380, 114 S.Ct. 1673. A claim of breach of contract—specifically, breach of an agreement that settled a prior federal suit—was held by the Court not to fall within that power. *Id.* at 380–81, 114 S.Ct. 1673 ("The facts to be determined with regard to such alleged breaches of contract are quite separate from the facts to be determined in the principal suit, and automatic jurisdiction over such contracts is in no way essential to the conduct of federal-court business.").

An expungement proceeding is different in kind. Its sole focus is the record of the conviction that occurred in this case, and the exercise of discretion it calls for is informed by, *inter alia,* the facts underlying the conviction and sentence and the extensive factual record created while Doe was under this Court's supervision for five years. And few things could be more essential to "the conduct of federal-court business" than the appropriateness of expunging the public records that business creates.

FN17. *Schnitzer,* 567 F.2d at 539 & 540 (quotation and citation omitted).

FN18. *United States v. Doe,* No. 71–CR–892 (CBM), 2004 WL 1124687, at *2 (S.D.N.Y. May 20, 2004) (quoting *Schnitzer,* 567 F.2d at 539).

FN19. *United States v. Sherman,* 782 F.Supp. 866, 868 (S.D.N.Y.1991); *see also United States v. McFadzean,* No. 93–CV–25 (CSH), 1999 WL 993641, at *3 (S.D.N.Y. Nov. 2, 2009) (expungement "is not commonly granted even in cases in which the defendant was acquitted of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

charges, much less where the defendant has been convicted by a jury or pleaded guilty[.]").

Typically, arrest records have been expunged where there was government misconduct or the conviction was somehow invalid, such as: (1) mass arrests which made the determination of probable cause impossible; (2) arrests effectuated only to harass civil rights workers; (3) police misuse of the records resulting in prejudice to the defendant; and (4) the statute underlying the arrest was later declared unconstitutional. *Schnitzer,* 567 F.2d at 540 (citations omitted).

FN20. *United States v. Doe,* 935 F.Supp. 478, 480–81 (S.D.N.Y.1996).

FN21. *See Doe,* 2004 WL at *3 (thirty-year period since conviction weighs in favor of expunging record); *see also Doe,* 935 F.Supp. at 480 (amount of time elapsed since conviction and defendant's conduct during that period were factors counseling in favor of expungement).

FN22. *See Doe,* 2004 WL at *3; *Doe,* 935 F.Supp. at 480–81.

FN23. *See e.g.,* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 12 & Ex. 9 (May 2004), *available at* http:// www.ussc.gov/sites/default/files/pdf/resear ch- and-publica- tions/re- search-publica-tions/ 2004/200405_Recidivism_Criminal_Histor y.pdf.

FN24. *See* Alfred Blumenstein & Kiminori Nakamura, Criminology Vol. 47, *Redemption in the Presence of Widespread Criminal Background Checks* Table 2 (May 2009), *available at* http:// jrsa.org/webinars/presentations/cch_part2– criminology–2009.pdf (finding, for example, that the risk of recidivism for individuals who committed a burglary or robbery offense at age 20 drops to the same risk level of arrest in the general population 3.2 and 4.4 years, respectively, after the individual has remained crime free).

FN25. *Gall v. United States,* 552 U.S. 38, 48, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). Probationers are subject to myriad conditions of probation that significantly impair their freedom. They cannot leave their judicial district, move, or change jobs before notifying and getting permission from their probation officer or the court. *Id.* They have to report to their probation officers on a regular basis and submit to unannounced home visits. *Id.* They must not associate with anyone convicted of a felony and must refrain from excessive drinking. *Id.* The court can also impose a variety of "special conditions" that make everyday life extremely difficult to navigate. *Id.* And the violation of a condition can be grounds for more onerous modifications of the conditions of supervision or even revocation of supervision and the imposition of a term of incarceration up to two years.

FN26. The goal of home detention is to punish by ensuring the offender leaves the home only for pre-approved good reasons. Thus, for ten months, Doe needed the advance approval of her supervising officer every single time she wanted to leave her home. There were some permissions she could obtain in blanket form; for example, the file reflects that during periods of un-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**

Page 12

employment, she could be out of the home beginning at 7:30 A.M. to bring her children to school, but she had to be back in the home by 9:00 A.M. She was given permission to leave at 2:30 P.M. to pick them up.

All other trips outside the home needed to be applied for and approved separately. Trips to church and the grocery store had to be requested two days in advance. All the normal tasks of daily life required advanced planning and approval. On March 24, 2003, for example, Doe got permission to leave the house to take one of her daughters for braces. Another entry from the previous November memorializes the permission she received to leave the home to do her laundry.

In addition, Doe was required to complete a personal financial statement and execute authorization forms for credit checks, tax returns, education checks, and the disclosure of her medical record. There was no detail about her personal life for a five-year period that was not covered by the paperwork in her probation file. She was regularly subjected to drug tests. She was directed to submit a sample of her DNA for analysis and entry into the FBI database.

Another section of the probation file records the innumerable home and community contacts that are regular incidents of community supervision. Supervising probation officers came to her home regularly, always in pairs, and always unannounced.

In short, there is no sense in which expunging the record of Doe's conviction so that she can retain employment minimizes the punishment she faced for committing her crime.

FN27. The government correctly notes that courts have traditionally declined to expunge records based on adverse employment consequences alone. *See* Resp. Br. at 5 (citing *United States v. Barrow,* No. 06–CR–1084 (JFK), 2014 WL 2011689, at *1 (S.D.N.Y. May 16, 2014); *Joefield v. United States,* No. 13–MC–367 (JBW), 2013 WL 3972650, at *1 (E.D.N.Y. Aug. 5, 2013); *Oyebola v. United States,* No. 10–MC–425 (JG), 2010 WL 2880167, 2010 U.S. Dist. LEXIS 72587 (E.D.N.Y. July 20, 2010)).

FN28. *See* N.Y.S. Dep't of State Div. of Licensing Law, Practice of Barbering License Law § 432 (Nov.2014), *available at* http://www.dos.ny.gov/licensing/lawbooks/barber.pdf.

FN29. The name and docket number of this case will be filed separately under seal so as not to make public the individual involved.

FN30. Marianne Levine, *Koch Industries to Stop Asking About Job Candidates' Criminal History,* Politico.com (Apr. 27, 2015), http://www.politico.com/story/2015/04/koch–industries–brothers–criminal–history–job–applicants–ban–the–box–117382.html. In 2014, Delaware and Nebraska passed "ban the box" legislation for most state, city and county jobs. Jeffrey Stinson, *A Criminal Record May No Longer Be A Stumbling Block To Employment In Some Places,* Huffington Post (May 22, 2014), http://www.huffingtonpost.com/2014/05/22/criminal-record-employment_n_ 5372837.html. In doing so, they joined at least ten other states and the District of Columbia, which have passed similar legislation since 1998. *Id.*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)
**(Cite as: 2015 WL 2452613 (E.D.N.Y.))**


E.D.N.Y.,2015.
Doe v. U.S.
--- F.Supp.3d ----, 2015 WL 2452613 (E.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

GA17

# NOTICE OF APPEAL

## UNITED STATES DISTRICT COURT

_____ Eastern _____ District of _____ New York _____

JANE DOE

- against -

UNITED STATES OF AMERICA

Docket Number _____ 14-MC-1412 (JG) _____

The Honorable John Gleeson
(District Court Judge)

Notice is hereby given that _____ the United States of America _____
appeals to the United States Court of Appeals for the Second Circuit from the:

Judgment _____ ;   Orders __X__ ;   Other _____ ;   _____ .
                                                                          (specify)

entered in this action on _____ May 21, 2015 and May 22, 2015 _____
                                                              (specify)

Offense occurred after November 1, 1987   Yes __X__   No _____

The appeal concerns: _____ Expungement of a Criminal Conviction _____

Date _____ June 19, 2015 _____          BRADLEY T. KING, AUSA
                                           (Counsel for Appellant)

TO:  Michael Tremonte, Esq.           Address:   United States Attorney's Office - EDNY
     Emily Burgess, Esq.                          610 Federal Plaza
     Sher Tremonte LLP                            Central, Islip, 11722
     80 Broad Street, Suite 1301
     New York, NY 10004                Telephone Number:   631-715-7875
                                       E-Mail:             Bradley.King@usdoj.gov
     (See additional page)
     ADD ADDITIONAL PAGE IF NECESSARY

---

(TO BE COMPLETED BY ATTORNEY)

| ▶ QUESTIONNAIRE | ▶ TRANSCRIPT ORDER   ▶ DESCRIPTION OF PROCEEDINGS FOR WHICH TRANSCRIPT IS REQUIRED (INCLUDE DATE) |
|---|---|
| ___ I am ordering a transcript.  _X_ I am not ordering a transcript.  **Reason:**  ___ Daily copy is available  _X_ U.S. Attorney has placed order  ___ Other. Attach explanation | Dates  Prepare transcript of  ___ Pre-trial proceedings _____  ___ Trial _____  ___ Sentence _____  ___ Post-trial proceedings _____ |

The ATTORNEY certifies that he/she will make satisfactory arrangements with the court reporter for payment of the cost of the transcript. (FRAP 10(b)) ▶ Method of payment ___ Funds ___ CJA Form 24

| ATTORNEY'S signature | /s/ | Date | June 19, 2015 |
|---|---|---|---|

---

▶ COURT REPORTER ACKNOWLEDGMENT        To be completed by Court Reporter and forwarded to Court of Appeals.

| Date order received | Estimated completion date | Estimated number of pages |
|---|---|---|
|  |  |  |

Date _____        Signature _____
                                          (Court Reporter)

COPY1 - ORIGINAL

*U.S. GPO: 2001-611-552/60002

TO:   Bernard Udell, Esq.
       26 Court Street
       Suite 412
       Brooklyn, NY  11242

       Jane Doe



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SA:BTK
F. #2015R00049

*610 Federal Plaza*
*Central Islip, New York 11722*

June 23, 2015

<u>By ECF</u>

The Honorable John Gleeson
United States District Court
United States Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

   Re: Jane Doe v. United States
     <u>14-MC-1412 (JG)</u>

Dear Judge Gleeson:

   The government writes respectfully to advise the Court that it has filed a notice of appeal in connection with the Court's May 21, 2015 (the "May 21st Order") and May 22, 2015 orders in this case (the "May 22nd Order"). The Office continues to discuss internally whether to pursue an appeal of the Court's Orders and, given the date (nearly thirty days from entry), the government has filed the notice to preserve its appellate rights. In addition, the government has been consulting with counsel to the Federal Bureau of Investigation concerning proposed modifications to the Court's May 21 and 22 Orders that will both effectuate the Court's intention of precluding the petitioner's prospective employers from learning of her health care fraud conviction and will allow the government to pursue legitimate law enforcement objectives, including the arrest and prosecution of Jean Maxon Lucien and Frantz Mevs, two of the petitioner's codefendants who absconded following their arrests in the underlying case, <u>United States v. Lucien</u>, 00-CR-1274 (JG), and who remain at large.

   Because the government has filed a Notice of Appeal to preserve its rights in this case, however, the Court may currently be divested of jurisdiction to modify its May 21 and 22 Orders. Accordingly, the government respectfully requests that, if the Office or the Department of Justice ultimately determines that an appeal is not warranted in this case, the Court afford the government the opportunity to address the scope of the Court's orders

and the implementation of them as currently written, which would substantially burden the government and have unintended consequences in related criminal proceedings.

Respectfully submitted,

KELLY T. CURRIE
Acting United States Attorney

By:    /s/_____
       Bradley T. King
       Assistant U.S. Attorney
       (631) 715-7875

cc:    Bernard Udell, Esq. (By Email)
       Michael Tremonte (By Email)
       Emily Burgess (By Email)
       Jane Doe (By Certified Mail)